

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00233-CV

———————————————

IN THE INTEREST OF B.H. A/K/A M.O., A CHILD

---

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-686684-20

---

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

M.H. (Mother) appeals from the trial court's order terminating her parental rights to her daughter B.H. a/k/a M.O. (Bella) and appointing the Department of Family and Protective Services (the Department) as Bella's permanent managing conservator.[1] In this ultra-accelerated appeal,[2] Mother raises a single issue challenging the factual sufficiency of the evidence supporting the trial court's best-interest finding. Because the evidence is factually sufficient to support that finding, we will overrule Mother's sole issue and affirm the trial court's judgment.

## I. Background

In March 2019, Mother gave birth to J.P. (John). Mother admitted to having used methamphetamines and marijuana throughout her pregnancy and tested positive for both drugs at John's birth. Because John's meconium was positive for amphetamines, methamphetamines, and cannabis, the Department removed him and placed him into foster care. Mother's parental rights to John were terminated in February 2020.

---

[1]We refer to children using aliases and to other family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]*See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

Six months later, in August 2020, Mother gave birth to Bella and tested positive for amphetamines, THC, and benzodiazepines at Bella's birth. As a result of Mother's continued drug use and concerns about drug use by Bella's father U.O. (Father),[3] the Department sued to terminate Mother's and Father's parental rights, and Bella was discharged from the hospital into foster care where she remained until trial.

The case was tried to the bench in July 2021. Dezarae Favors, a permanency specialist with Our Community Our Kids (OCOK) and Bella's caseworker,[4] testified that Bella came into foster care because Mother had tested positive for amphetamines, THC, and methamphetamines at Bella's birth.[5] Bella's meconium also tested positive for those three drugs.

---

[3]Father is not John's father.

[4]OCOK is a private provider of community-based care that contracts with the Department to provide "foster care case management, kinship, and family reunification services" in parts of the state, including Tarrant County. *See* Tex. Dep't of Family & Protective Servs., https://content.govdelivery.com/accounts/ TXDFPS/bulletins/27e68be (last visited Dec. 29, 2021); *see also* Tex. Fam. Code Ann. §§ 264.151–.172 (describing and providing requirements for Department oversight of private community-based-care system for the State of Texas).

[5]We note the affidavit supporting Bella's removal and Bella's medical records, which were admitted into evidence, stated that Mother had tested positive for amphetamines, THC, and *benzodiazepines*, rather than amphetamines, THC, and *methamphetamines* as Favors testified.

Favors—who was also John's caseworker when Mother's parental rights to him were terminated[6]—was concerned about Mother's ability to safely parent Bella because of Mother's continued drug use, Mother's unstable living conditions, and Mother's lack of means to care for Bella. Favors was also concerned about Father's drug use and his unstable living conditions.

To address the Department's concerns, Favors developed service plans for both parents.[7] Mother's service plan included creating a stable environment, remaining in contact with Favors, attending parenting classes, completing a psychosocial assessment, attending anger-management classes, and submitting to a drug assessment and to random drug testing. Father's service plan was essentially the same as Mother's. According to Favors, the service plans included anger-management classes because the parents were observed arguing and fighting in the hospital at Bella's birth.

Neither parent engaged in any of the services outlined in their plans. Regarding drug testing, Favors had asked Mother to submit to random drug testing in September and October 2020 and in April, June, and July 2021. Mother never complied, which concerned Favors because although Mother had insisted that she was not using drugs,

---

[6]The order terminating Mother's parental rights to John was admitted into evidence.

[7]The family plan containing both parents' service plans was admitted into evidence.

4

she needed to prove that she was clean and sober. Drug testing was also essential so that the Department could "follow up with a drug assessment for her." Favors had also asked Father to submit to drug testing in September and October 2020, as well as in February, April, June, and July 2021. Like Mother, Father never complied. When Mother told Favors that she did not have transportation because Father was at work, the Department rescheduled Mother's testing "for when he was off," but neither parent went for testing. The parents' plans stated that they understood that a failure or refusal to comply with a random-drug-testing request would be "a presumed POSITIVE for ALL substances."

Under the plans, the parents were permitted weekly visits with Bella. But the parents attended only about five visits during the nearly year-long case. Their last visit was in April 2021, about three months before trial. The parents had a visit planned the month before trial, but the visit had to be postponed because Bella had hand, foot, and mouth disease. The visit was rescheduled for the following week, but the parents did not show up.

The parents attended the visits together, but Favors was concerned about the parents' behavior during the visits, especially Mother's:

> My concern[] was for [Mother], throughout the visit, she would be very anxious. She would not -- could not sit still. She would get upset if [Father] would ask questions on how to care for the baby.

> During one of the visits, she got upset, walked out, and sat in the hall throughout the remainder of the visit.

5

The parents would argue amongst each other in the visit about living situations that's going on in their home, throughout the whole entire visit.

At least one of the parents' visits had to be cut short because the parents were arguing so much. Favors was concerned about domestic violence between the parents because Mother had complained to Favors that Father was "abusive toward[] her at times" but would later recant her story. And during a Zoom visit sometime in 2021, Favors observed that Mother had a black eye.

Favors did not believe that it would be safe to return Bella to her parents. By contrast, Bella's foster home was safe and loving. Bella had been living in the same foster home since her discharge from the hospital.[8] Bella's brother John lived there, and Bella was bonded with him, her foster parents, and the foster parents' biological child. Additionally, Bella's foster parents could provide for Bella's current and future physical, emotional, developmental, medical, and emotional needs. Favors believed that terminating Mother's and Father's parental rights was in Bella's best interest and stated that the Department's plan for Bella was adoption by her foster parents, which Favors also thought was in Bella's best interest.

Favors confirmed that Mother had received a written copy of the service plan in August 2020 when Favors met with Mother to review the plan and that Mother had

---

[8]Favors testified that the Department had tried to place Bella with family members, but the only possibility was Father's sister, who refused to take Bella, "due to her brother's current drug use" and "due to the behavior that goes on between him and his current girlfriend, which would be [Mother]."

understood the plan. Favors maintained contact with Mother throughout the case, and Mother had Favors's telephone number and email address.

Favors further testified that because of the COVID-19 pandemic, all drug and alcohol assessments in August 2020 were conducted "by video call." Mother was directed to call Recovery Resources to request a phone interview. According to Favors, Mother had access to Father's telephone and had her own telephone later in the case. But when Favors asked Mother about her service plan during Mother's visits with Bella, Mother "would state that she would get to it" but never did call to schedule an assessment.

Favors admitted that Mother did not have transportation but that Father took Mother where she needed to go. Favors thus believed that Mother had access to transportation to go to a drug test. But if Mother did not in fact have transportation and had asked Favors for help, Favors averred that she would have helped Mother with transportation. Favors further testified on cross-examination that Mother did not take her parenting classes online and had not asked for Favors's help in setting them up.

Favors stated that Mother and Father were living with Father's mother. From what Favors had seen on Zoom, she did not believe that the home was safe and appropriate housing for a child because Father's other girlfriend lived there and there was a lot of fighting in the home. But Favors admitted that she had not been to the home. When asked whether it would be in Bella's best interest for Mother "to be

given more time to work services, if she decided to, maybe go to a shelter or something like that, where she would be removing herself from any domestic violence concerns," Favors responded,

> [Mother] has had almost a year to work her service -- plan of service. Whenever I do reach out to her and we talk, which might be every other month or so, she just hasn't started it. It's no -- nothing is stopping her from starting her services. She just hasn't started to complete her services. She knows what to do. She just doesn't want to complete them.

Regarding Father, Favors admitted on cross-examination that she had no proof of Father's drug use and that she had not actually witnessed domestic violence between Mother and Father. But Mother confirmed to Favors that Father used drugs, and the Department had no drug-test results because Father had refused to test. Favors had also observed behavior by Father during visits with Bella that indicated drug use: extreme anxiety throughout one visit—"he would constantly move, keep walking up and down"—and falling asleep during another visit to the point that Mother "had to keep nudging him to wake him up throughout the visit."

Father did not testify, but Mother did. Mother stated that she depended on Father for transportation and that she was unaware that she was supposed to complete her services by videoconference and telephone due to the pandemic. She admitted that she had received a copy of her service plan, reviewed her required services, and discussed those services with the Department's attorney. She further admitted that she knew that she was supposed to call to schedule her drug assessment but claimed that she did not make those calls because she did not have a telephone

8

and was unable to use someone else's telephone. Mother also knew she was supposed to take parenting classes but claimed that she was not able to do so because she lacked a telephone and transportation. Although she claimed to not have a telephone, Mother stated that she had called Favors to tell her that she was having trouble doing her service plan because she "needed help getting transportation to go to where [she] needed to go." Mother claims that Favors told her that she couldn't help Mother with transportation.

Mother understood the Department's concerns about drug use and family violence. When asked about her current living arrangements, Mother testified that she lived with Father, Father's mother, and Father's brother. But when asked whether she believed that the home was a safe environment for Bella, Mother responded, "I'd rather not answer."

Mother wanted the trial court to give her custody or possession of Bella but understood that the court couldn't do so unless Mother was clean and sober. Mother stated that she would prove that she was clean and sober through drug testing, but when her attorney asked if she would go for testing that day, Mother responded, "No, I can't make it today. I don't have a vehicle." When asked whether she was able to go the next day, Mother said, "Well, I can't answer that either, because I don't have a vehicle, and I don't have reliable transportation, and I have high blood pressure. Medically, I'm not really able to walk around too much because my blood pressure

gets so high." But despite this medical condition, Mother believed that she was healthy enough to be able to take care of Bella.

On cross-examination, Mother stated that she had advised Favors that she had purchased a vehicle with her stimulus money but that after she'd had the vehicle for about a week, she stopped driving it "because the brakes were not right, and there was a little leak on the bottom under the vehicle." A couple of weeks later, Father "used [the vehicle] to pull some tin, and the--how do you call it--the thing underneath blew a hole in it, and so now it doesn't work anymore." Mother did not have the money to fix the vehicle, so she was left without one. Father, on the other hand, had three vehicles.

When asked whether John was born positive for amphetamines, methamphetamines, and marijuana, Mother responded, "That's what they say." She stated that she did not know whether those were the same drugs that Bella had tested positive for at birth because Mother "never saw [Bella's] drug tests." Mother admitted that she had an opportunity to engage in services while John was in foster care but was never able to finish those services even though she had started them.

The ad litem gave a brief report that echoed the Department's recommendation:

> I did visit with the foster mom at her home, and I visited with the -- well, to the extent you can -- the little girl under one. Very happy. Probably the happiest baby I've ever seen. Healthy. She was just waking up from a nap. Mom took care of her, diapered her. We visited for a while.

The home is safe, loving, lots of – just pictures of everyone on the wall. I -- I just -- based on the evidence, I -- my recommendation would be the same as the Department's.

And I -- I -- I really hope that the foster parents are able to adopt the child. That's the best scenario for her.

At the trial's conclusion, the trial court terminated Mother's and Father's parental rights and appointed the Department as Bella's permanent managing conservator. As to Mother, the trial court found by clear and convincing evidence that termination of Mother's parental rights to Bella was in the child's best interest and that the Department had established by clear and convincing evidence the conduct grounds under Subsections (D) (endangering environment), (E) (endangering conduct), (N) (constructive abandonment), (O) (failing to complete service plan), and (R) (causing the child to be born addicted to drugs or alcohol).[9] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (R), (b)(2). The trial court also found that Mother had failed to prove by a preponderance of the evidence that she was unable to comply with a court-ordered service plan and that despite making a good-faith effort, her failure to comply was not her fault. *See id.* § 161.001(d). The trial court thus terminated Mother's parental rights to Bella and appointed the Department as Bella's permanent managing conservator.

---

[9]Because Father has not appealed the termination of his parental rights, we do not detail the trial court's findings against him.

Mother timely appealed and, in a single issue, challenges the factual sufficiency of the evidence supporting the trial court's best-interest finding.

## II. Burden of Proof and Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and 2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the parent violated a predicate ground listed in Section 161.001(b)(1) and that termination of the parent–child relationship would be in the child's best interest.[10] Tex. Fam. Code Ann.

---

[10]Clear and convincing evidence of one pleaded conduct ground is sufficient to support a termination decision if coupled with sufficient best-interest evidence. *See*

§ 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### III. Best-Interest Analysis

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;
- the child's emotional and physical needs now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;

---

*In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.). Here, however, Mother has not challenged any of the trial court's conduct-ground findings. We thus will not address the sufficiency of the evidence supporting any of those findings.

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

As to the child's desires, Bella was just shy of her first birthday at the time of trial. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see In re M.R.*, No. 02-19-00212-CV, 2019 WL 6606167, at *8 (Tex. App.—Fort Worth Dec. 5, 2019, pet. denied) (mem. op.) (stating that because of child's infancy, the factfinder could consider the

child's bond with her foster family in lieu of the child's desires). These considerations are also relevant to the factors regarding the Department's plan for Bella and the stability of the proposed placement. *See M.R.*, 2019 WL 6606167, at *8. Favors testified that Bella had lived in the same foster home since birth and that Mother had visited Bella only about five times during the case. Bella's brother John lived in the same foster home, and Bella was bonded with him, her foster parents, and the foster parents' biological child. Favors further testified that the Department's plan for Bella is adoption by her foster parents. These factors weigh in favor of the trial court's best-interest finding.

Regarding Bella's physical and emotional needs now and in the future and the physical and emotional danger to Bella now and in the future, Favors testified that Bella's foster parents could provide for Bella's current and future physical, emotional, developmental, medical, and emotional needs. By contrast, Mother had reported to Favors that Father had abused Mother, and Mother had a history of drug use. John tested positive for drugs at birth in March 2019. And as evidenced by Mother's and Bella's positive drug tests, Mother was still using drugs in August 2020. Throughout this case, Mother refused to be drug tested, and according to her service plans, those refusals were presumed to be positive test results for all substances. Mother's drug use is also relevant to Mother's parenting abilities as well as to acts or omissions indicating that the existing parent–child relationship is not a proper one. These factors also weigh in favor of the trial court's best-interest finding.

15

Regarding the stability of Mother's home, Favors testified that Mother lacked a stable living environment but admitted that she had never visited Father's mother's home where Mother lived with Father. But based on what Favors had seen on Zoom, she did not believe that the home was safe and appropriate for Bella because of fighting in the home and because Father's other girlfriend also lived there. Mother stated that she was in a relationship with Father, but the presence of Father's other girlfriend in the home casts doubt on that relationship and thus the stability of Mother's housing, especially since Mother appeared to be totally dependent on Father.[11] And as noted, both parents had presumed-positive drug-test results because they had refused to be tested and there were family-violence concerns. This factor weighs in favor of the trial court's best-interest finding.

Regarding the programs available to assist Mother in promoting Bella's best interest, Mother did not start, much less complete, her service plan. On appeal, Mother complains that the COVID-19 crisis—"which caused the near shutdown of the State and the resulting safety protocols"—prevented Mother from accessing available programs and from completing her service plan. Although there is evidence that the COVID-19 pandemic's attendant closures meant that Mother was required to complete some of her services by telephone or by video conference, there is no evidence that the pandemic itself rendered Mother unable to comply with her plan.

---

[11]Mother's service plan stated that she was unemployed and "is currently relying on friends for housing."

Rather, Mother stated that her lack of a telephone and transportation left her unable to complete her services.

Favors, however, testified that Mother had access to Father's telephone and had her own telephone later in the case, and Mother testified to calling Favors. Favors also believed that Mother had access to transportation because Father took Mother everywhere she needed to go. And according to Favors, if Mother had asked for help with transportation, Favors herself would have helped. Although Mother claimed that Favors declined to help Mother with transportation when Mother had complained that she was having trouble doing her service plan, the trial court could have disbelieved this testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (stating that the factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony). This factor weighs in favor of the trial court's best-interest finding. *See M.R.*, 2019 WL 6606167, at *9 ("A parent's noncompliance with a service plan may be considered as evidence in favor of termination in the child's best interest.").

As to Mother's plans for Bella, there was no evidence presented regarding those plans other than Mother's stating that she wanted custody of Bella. This factor thus weighs neither for nor against the trial court's best-interest finding.

Most of the *Holley* factors weighed in favor of terminating Mother's rights to Bella. Based on our review of the entire record and giving due deference to the factfinder's best-interest finding, we conclude that the factfinder reasonably could

17

have formed a firm conviction or belief that termination of Mother's parental rights was in Bella's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *C.H.*, 89 S.W.3d at 18–19. We thus hold that the evidence is factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *C.H.*, 89 S.W.3d at 18–19. We overrule Mother's only issue.

## IV. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment terminating Mother's parental rights.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: January 6, 2022